IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

NORTHERN NATURAL GAS
COMPANY,

          Plaintiff,

vs.

80 ACRES OF LAND IN THURSTON
COUNTY, NEBRASKA; et al.,

          Defendants.

8:17-CV-328

MEMORANDUM AND ORDER

    This dispute involves the renewal of a right-of-way across tribal and allotted lands located within reservation boundaries of the Omaha Tribe of Nebraska. The plaintiff, Northern Natural Gas, filed this suit seeking to condemn individually owned interests in two parcels of allotted land: Allotment No. 742-2 and Allotment No. 742-4. Filing 30 at 2. The defendants in this case each have an individual interest in Allotment No. 742-2, Allotment No. 742-4, or both.

    Northern filed a partial motion for summary judgment (filing 35) asking the Court to confirm its right to condemn the individual interests in those Allotments. At least one defendant, Nolan J. Solomon, disputes Northern's power to condemn the property.[1] For the reasons discussed below, the Court will grant Northern's motion for summary judgment.

---

[1] Defendant, United States of America, does not oppose Northern's motion for summary judgment. *See* filing 31 at 1-5. The remaining defendants have not responded.

BACKGROUND

Northern Natural Gas owns and operates a pipeline system spanning much of the Midwest. Filing 30 at 2. In 1931, Northern obtained a right-of-way allowing three of its pipelines to cross the Omaha Tribe's Reservation located in Thurston County, Nebraska. Filing 30 at 2-3. That right-of-way was renewed in 1992 for a thirty-year term set to expire on February 7, 2018 ("the original ROW"). Filing 37-2.

In anticipation of the original ROW's expiration, Northern initiated a renewal process with the Bureau of Indian Affairs ("BIA"). Filing 30 at 3-4. This process, at least originally, went smoothly: Northern and the Omaha Tribe entered into an agreement to renew the rights-of-way across tribal trust lands ("the New ROW"), *see* filing 37-3 at 1-7, a majority of the individual interest holders in Allotment No. 742-2 and Allotment No. 742-4 consented to that grant, *see* 25 U.S.C. § 324, and the BIA approved the New ROW and granted Northern the right-of-way, *see* filing 37-5. But at some point, one of the individual interest holders in Allotment No. 742-2 and Allotment No. 742-4 withdrew his consent. Filing 30 at 3. That meant Northern would need to acquire its right-of-way across Allotment No. 742-2 and Allotment No. 742-4 by virtue of condemnation rather than agreement. *Compare* 25 U.S.C. § 324 *with* 25 U.S.C. § 357.

So, Northern filed the underlying complaint seeking condemnation of the Allotments. *See* filing 30 at 1-7. A few weeks after this condemnation action was initiated, one of the individual interest holders in Allotment No. 742-2 and Allotment No. 742-4, Nolan J. Solomon, deeded a fractional interest to the United States in trust for the Omaha Tribe. Filing 37-6; filing 37-7. Now, Solomon contends that because of the Tribe's interest in those parcels of land, Northern cannot condemn the Allotments. *See* filing 42 at 4. As a result,

Northern has filed a partial motion for summary judgment asking the Court to confirm its right to condemn the interests of the remaining individual owners. Filing 35 at 2.

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson,* 643 F.3d at 1042.

## DISCUSSION

Before proceeding to the merits of the parties' arguments, the Court must take a brief detour through the history of Federal Indian policy—specifically through the history of Indian land tenure. That history is marked by periods of shifting policy goals that are inconsistent and at times irreconcilable, which have shaped the current landscape of this litigation. *See* American Indian Law Deskbook 36-37 (Larry Long et al. eds., 4th. ed., 2008).

To begin, in the early nineteenth century, the government began pushing Indian tribes west where they were confined onto reservations. *See, e.g.*, *Williams v. Lee,* 358 U.S. 217, 221-23 (1959). The underlying purpose of this policy was to segregate tribes—both territorially and politically—from the rest of society. *Id.*; *see also* American Indian Law Deskbook at 34. Later in the nineteenth century, the government shifted its efforts away from segregation and towards integration. *Id.* To accomplish this new goal, Congress passed the General Allotment Act which required portions of Indian reservation land to be transferred (*i.e.,* allotted) to individual tribal members. *Babbitt v. Youpee,* 519 U.S. 234, 237 (1997). Land not allotted to individual tribal members was opened to non-Indians for settlement. *Id.* at 237. The United States, however, continued to hold fee title to allotted lands in trust, subjecting the individual allottees to various restraints on alienation. *Id.* Those restraints on alienation meant that on the death of the allottee, the land descended according to the laws of the State or Territory where the land was located—a policy which "proved disastrous for the Indians." *Hodel v. Irving,* 481 U.S. 704, 707 (1987); *see also* 24 Stat. 389. Indeed, because the land was held in trust and often could

4

not be partitioned, allotted parcels became splintered into multiple undivided interests with some parcels having hundreds, and many parcels having dozens, of owners. *Id.*

In 1934, Congress again changed course, by passing the Indian Reorganization Act of 1934. That legislation was intended to restore "the principles of tribal self-determination and self-governance" that prevailed before the General Allotment Act. *County of Yakima v. Confederated Tribes and Bands of Yakima Nation*, 502 U.S. 251, 255 (1992). The Indian Reorganization Act halted further allotments, began restoring unallotted surplus land, and indefinitely extended the trust periods for parcels of land that were not yet fee-patented. *Id.*; 25 U.S.C. § 5101. But the Indian Reorganization Act "made no attempt to withdraw lands already conveyed to private persons through fee patents (and by now sometimes conveyed to non-Indians)." *Upper Skagit Indian Tribe v. Lundgren*, 138 S. Ct. 1649, 1653 (2018). As a result, reservations today contain two kinds of land: tribal trust land held by the United States, and individually owned allotted land with dozens of fractional interest holders. *Id.*

That mix—tribal land, and individually owned allotments located within reservation boundaries—produced and informs this litigation. Specifically, Northern's pipeline crosses the lands of the Omaha Tribe Reservation which, like many reservations, includes a mix of allotted land and tribal trust land. The parcels at the center of this dispute were, at least originally, individually owned allotted land. But, following Solomon's conveyance to the United States in trust for the Omaha Tribe, *see* Filing 37-6; filing 37-7, those parcels were no longer exclusively allotted lands. Instead, Allotment No. 742-2 and Allotment No. 742-4 now contain both individually owned interests and tribal trust interests. Filing 37-6; filing 37-7. And the existence of those tribal interests,

Solomon claims, necessarily prohibits the renewal of Northern's right-of-way. *See* filing 42 at 2.

To support why, in his view, the right-of-way cannot be renewed, Solomon relies on the Eighth Circuit's decision in *Nebraska Public Power District*, 719 F.2d 956, 958 (8th Cir. 1983). In that decision, a public power district filed a condemnation action seeking to condemn various parcels of land across the Winnebago Tribe's reservation. But at some point before the condemnation action was filed, the Winnebago Tribe had been deeded an undivided future interest in some of the parcels along the proposed route. *See id.* at 958. That meant that some of the parcels the power district sought to condemn were mixed parcels of both tribal trust interests and individually owned interests. *Id.* The power district argued it had the power to condemn the entire parcel of land irrespective of the new tribal interest.

But the Court of Appeals found that when the Tribe owned a fractional interest in a mixed parcel, the parcel is considered tribal land and as such, is no longer subject to condemnation. *See id.* at 961. That conclusion was based, in large part, on the plain language of 25 U.S.C. § 357, which provides that "[l]and allotted in severalty to Indians may be condemned for any public purpose under the laws of the State or Territory," but omits language authorizing condemnation of tribal trust lands. In other words, where the tribe owns an undivided interest in previously allotted land, no law authorizes the condemnation of the tribal interests.

Even so, the *Nebraska Public Power District* decision does not actually help Solomon: although the Court of Appeals was clear that no power exists to condemn tribal interests in tribal land, it did not categorically foreclose approval of the right-of-way. Instead, the court emphasized that an alternative method for obtaining a right-of-way exists: the "consent of the Secretary [of the

6

Interior] and the proper tribal officials." *Neb. Pub. Power Dist.*, 719 F.2d at 961 (citing 25 U.S.C. § 324); *see also WBI Energy Transmission, Inc.*, No. 1:14-cv-130, 2017 WL 532281, at *4 (D. Mont. Feb. 8, 2017).

And here, Northern has satisfied this alternative method; it has obtained the proper tribal and agency consent. Indeed, on December 4, 2017, Northern and the Omaha Tribe entered into a contractual agreement (*i.e.,* the "New ROW") renewing the rights-of-way for natural gas pipelines "traversing lands held in trust by the United States for the benefit of the Tribe within the boundaries of the Omaha Tribe's reservation . . . ."*See* filing 37-3 at 1. A few days later, the Omaha Tribal Council approved that agreement and authorized the renewal of Northern's pipelines. Filing 37-4 at 1-4. And on December 12, the BIA approved the "New ROW" and granted Northern a right-of-way to "operate, inspect, maintain, and terminate natural gas pipelines on tribal and allotted lands . . . located on the Reservation of the Omaha Tribe of Nebraska." Filing 37-5 at 1.

The BIA renewal specifically "incorporate[d] by reference the conditions or restrictions set out in . . .[the] [a]greement between the Omaha Tribe of Nebraska and the Northern Natural Gas Company." *See* filing 37-5 at 4. And the "New ROW" explicitly provides that

> if [the Tribe] acquires an interest in an allotment tract during the term of the Rights-of-Way consented to herein . . . the provisions of this agreement shall apply to the Tribe's interest or newly-acquired Tribal interest in such allotment tract without further compensation to the Tribe.

Filing 37-3 at 6.

7

Stated another way, when the BIA renewed Northern's right-of-way across the Omaha Tribe's trust land, *see* 25 U.S.C. § 324, it also authorized that right-of-way to cross newly acquired trust interests deeded to the Tribe between February 8, 2018 and February 9, 2046. That means Solomon's February 23, 2018 conveyance is precisely the type of land acquisition the "New ROW" sought to include and govern. And because Solomon's conveyance is governed by the "New ROW", contrary to Solomon's contention, the Tribe has consented to Northern's right-of-way across Allotment No. 742-2 and Allotment No. 742-4. Filing 37-6.[2]

To that end, Solomon cannot use the Omaha Tribe's newly acquired interest in Allotment No. 742-2 and Allotment No. 742-4 to prevent the renewal of a right-of-way the Tribe has already consented to. Accordingly, Northern may condemn the remaining individually owned interests in Allotment No. 742-2 and Allotment No. 742-4. *See Pub. Serv. Co. of New Mexico v. Barboan, 857 F.3d 1101, 1105 n. 5 (10th Cir. 2017)* (implying that allotted interests in mixed land may be subjected to condemnation if the "tribal interests [are left] undisturbed"); *WBI Energy Transmission, Inc.*, 2017 WL 532281, at *4 (allowing the condemnation action to proceed against the individual interests but not the tribal interests in tribal trust land). The Court will grant Northern's partial motion for summary judgment.

---

[2] The Court notes that there is a colorable argument that that tribal consent, alone, is sufficient—in other words, that condemnation of the allotted interests in those parcels wasn't required. *See* 25 C.F.R. §§ 169.1-.2 (2016); *Neb. Pub. Power Dist.*, 719 F.2d at 958. But because Northern proceeded with the condemnation action anyway, the Court will consider any such argument to have been waived.

IT IS ORDERED:

1. Northern's motion for partial summary judgment (filing 35) is granted.

2. Northern's condemnation action may proceed over Nolan Solomon's objection.

Dated this 26th day of July, 2018.

BY THE COURT:

John M. Gerrard
United States District Judge